## ATTACHMENT B
## AFFIDAVIT OF FEDERAL BUREAU OF INVESTIGATION SPECIAL AGENT BRANDON J. BERNHARDT

I, Brandon J. Bernhardt, a Special Agent (hereinafter, SA) with the Federal Bureau of Investigation (hereinafter, FBI), being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am an SA with FBI and have been so employed since July 2019. I am currently assigned to the Kansas City Division of the FBI, Joplin Resident Agency, Joplin, Missouri where I am assigned to investigate a broad array of federal criminal activity, including offenses under Titles 18 and 21 of the United States Code (hereinafter, USC). I completed Special Agent training at the FBI Academy in Quantico, Virginia in November 2019, and was assigned to the Minneapolis Division of the FBI following my graduation. While at the Minneapolis Division, I was assigned to investigate matters of National Security, specifically counterintelligence investigations. Prior to becoming a Special Agent, I was employed by the Federal Reserve Bank of Kansas City, Kansas City, Missouri as a Bank Examiner.

2. The statements in this affidavit are based on my personal observations, training and experience, investigation of this matter, and information obtained from other law enforcement officials, and witnesses. Because this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included each and every fact known to me concerning this investigation.

3. This affiant has set forth the facts necessary to establish probable cause to believe that Thomas Christopher ROSS, (hereinafter, ROSS) has violated Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C) and 846, that is, conspiracy to distribute a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, and a mixture or

substance containing a detectable amount of amphetamine ("Adderall"), a Schedule II controlled substance.

## STATUTORY AUTHORITY

4. Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), make it unlawful for any person to knowingly or intentionally manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance in Schedule I or II.

5. Title 21, United States Code Section 846, makes it a crime to attempt or conspire to commit any drug offense under the Controlled Substances Act.

## PROBABLE CAUSE

6. On Thursday, July 30, 2026, the FBI was contacted by the Joplin, Missouri, Police Department (hereinafter, JPD) regarding a public corruption matter in Joplin, Missouri. According to the initial information provided by JPD, C.S., the former campaign manager for ROSS, had been asked by ROSS to plant drugs on his opponent, Louise Secker (hereinafter, Secker).

7. According to the Missouri Secretary of State's (hereinafter, MO SOS) website, ROSS and Secker were both certified Republican candidates for Missouri State Representative – District 161; both having filed on February 24, 2026. The MO SOS website also indicates that ROSS was the Republican nominee following the results of the August 4, 2026, primary election, with ROSS having defeated Secker by approximately 33 votes.

8. During the initial debriefing, C.S. provided law enforcement with a black nylon glove that he stated had been provided to him by ROSS. Inside of the glove was a small, plastic bag. Inside of the bag was a small amount of white powder. Law enforcement attempted to use a TruNarc on the white substance but were unable to obtain a reading based on the small amount of substance within the bag. As such, a Nartec Inc. Cocaine Test Kit was used. The ampule of the test

kit turned blue when it encountered the white powder, indicating a positive hit for cocaine, a Schedule II controlled substance.

9. Additionally, inside of the glove was a pink and white capsule, with ELI-513 inscribed on it. The capsule was identified as Amphetamine and Dextroamphetamine 20 mg extended release, also known as Adderall, a Schedule II controlled substance. C.S. advised at that time that ROSS was believed to have a prescription for Adderall, which was where he believed the capsule originated.

10. At the time of the initial debriefing, C.S. disclosed that he communicated with ROSS using telephone number 417-483-5266, where they had exchanged text messages regarding the "substance of the matter." C.S. understood ROSS's messages regarding the substance of the matter to be in reference to his request for C.S. to plant drugs on Secker. C.S. initially provided law enforcement with various screenshots of messages he had with ROSS. I reviewed those screenshots and observed that C.S. received the message, "Taking it no luck with the substance of it all?" on June 21, 2026, and the message, "If you aren't able to get the substance of the situation handled, I need to get everything else pushed just in case [.]" on June 27, 2026.

11. Based upon my review of the text messages received thus far from C.S., I believe the earliest reference to the plot to plant drugs on Secker occurred during two text messages C.S. received on May 31, 2026, that read, "We need to resolve that situation sooner than later…June 9th she will be at the republican women meeting at granny shaffers." and "I was hoping that we could make it happen before THIS Thursday…which would be extreme egg on the face given Thursdays nights event".

Consensual Monitoring of ROSS

12. On Friday, July 31, 2026, the FBI provided C.S. with a covert audio recording device to be used during a meeting with ROSS later that morning.

13. The meeting between ROSS and C.S. on July 31, 2026, was conducted at ROSS's residence, located at 2607 South Minnesota Avenue, Joplin, Missouri; a location within the Western District of Missouri. Approximately 1 hour and 18 minutes into the conversation, C.S. told ROSS that he still had "the bag and addies" if ROSS wanted him to "try." ROSS agreed and told C.S. that Secker had been carrying a small purse and C.S. suggested that they could call in an anonymous tip that Secker had drugs in her car. C.S. then asked ROSS if that was something he still wanted done, to which, ROSS responded with "if you can pull it off…pull it off."

Clarifying Interviews and Information from C.S.

14. During the week of August 24, 2026, clarifying interviews were conducted with C.S. regarding the allegations described herein. According to C.S., ROSS provided C.S. with the black glove with narcotics on or about early June 2026 while they were together at ROSS's office. C.S. described the location of ROSS's office to be located within the downtown Joplin, Missouri, area on Joplin Avenue; a location within the Western District of Missouri. At the time of the handoff between ROSS and C.S., ROSS told C.S. that the glove contained a baggie with some "coke" and a couple of Adderall.

15. C.S. stated ROSS had instructed him to place the bag in Secker's purse or vehicle while he was on vacation if he had an opportunity to do so. C.S. further clarified that ROSS went on vacation to Myrtle Beach during mid-June 2026, with ROSS having provided C.S. with the narcotics before his departure. The affiant is aware that Myrtle Beach is a city within the state of South Carolina, which is frequently abbreviated as SC. The information regarding ROSS's travel

was later corroborated in a text message conversation between ROSS and C.S., with the following messages exchanged on Sunday, June 14, 2026:

*ROSS: How did you all manage through the storms?*

*C.S.: I'm out already looking, it was crazy last night. I'm good, just tired from being up until 3 lol. All in all, could have been much worse. I'm on it though. (thumbs up)*

*C.S.: You guys doing ok? I forgot you were driving through the whole line of storms.*

*ROSS: We are good...it was a bit bumpy at points but made it to SC in one piece*

*C.S.: Very nice! We'll have a good time, we are going to start hitting precinct 1 this evening and tomorrow*

16. Furthermore, after further review of the messages provided by C.S., the following messages were exchanged between ROSS and C.S. regarding the "substance of the matter" during the time when ROSS was believed to be in SC:

<u>Monday, June 15, 2026:</u>

*ROSS: According to sources. She got endorsed now too.*

*ROSS: Hope you all are having success knocking doors and getting the substance of the matter sorted this week.*

<u>Thursday, June 18, 2026:</u>

*ROSS: Any luck with the substance of the matter? I wont be gone much longer.*

17. Moreover, I reviewed the additional messages between C.S. and ROSS that occurred on June 21, 2026, as was discussed above. During the messages, the following conversation transpired:

*ROSS: Taking it no luck with the substance of it all?*

*C.S.: I am actually creeping down to the car show right now and seeing if I can see your*

*car. I have had it on me for a couple days in order to be able to take full advantage of any opportunity that arise.*

*C.S.: I thought I had it at the forum. Walter went to, but never got close in car was locked*

*ROSS: Also…Tuesday night I need as many people at the event in the campaign shirts as possible and people working "booth"….*

*ROSS: I have more shirts for other people as needed*

*ROSS: Hartwell got her guys for the signs…football boys from mssu*

*ROSS: (Photo)*

*C.S.: Unreal.*

*C.S.: But MSSU wanted us to change our entire stuff because Brian had an MSSu logo on his shirt. (eye roll emoji) how you know she's a lib*

*ROSS: A good time would have been while signs were going up….she would have been a ways away from an unlocked car*

18. C.S. also disclosed to law enforcement that he had previously purchased a two-gram disposable, of what he believed to be pot (hereinafter, marijuana), for a friend from ROSS on or about July 2026 for $40, at ROSS's office. During the time of the marijuana purchase from ROSS, C.S. observed additional vapes and/or disposables inside of a small ammunition container. Following this interaction, C.S. questioned ROSS about the additional vapes/disposables that he had previously observed while they were together at his office. ROSS told him that he had got rid of them and had implied to C.S. that he had sold them. ROSS never specified to C.S. where he obtained the marijuana or cocaine.

19. C.S. further clarified during an interview with law enforcement that the only coded language within the messages between himself and ROSS was in reference to the drug plot against Secker.

20. Furthermore, based on my training and experience, I know that transactions and distribution of illegal narcotics frequently involve the use of telecommunication devices and messages, such as text messages. I am also aware that these messages frequently use coded language in order to obfuscate the subject matter, that being illegal narcotics, in the event of law enforcement detection.

## CONCLUSION

21. Based on the above facts, this affiant believes there is probable cause to support the filing of a criminal complaint against Thomas Christopher ROSS for violations of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C) and 846, that is, conspiracy to distribute a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, and a mixture or substance containing a detectable amount of amphetamine ("Adderall"), a Schedule II controlled substance.

Brandon J. Bernhardt
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed to before me in my presence via telephone, this 2nd day of September 2026, in the Western District of Missouri.

HONORABLE DAVID P. RUSH
United States Magistrate Judge
Western District of Missouri